**Karl Frederick SCHULTZ, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 01–13–00505–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 20, 2014.

Jim Medley, Houston, TX, for Appellant.

Devon Anderson, District Attorney, Harris County, Kevin Keating, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

LAURA CARTER HIGLEY, Justice.

Appellant, Karl Frederick Schultz, was charged by indictment with driving while intoxicated.[1] Appellant moved to suppress the results of his breath test, and the trial court denied the motion. Appellant then pleaded guilty to the offense, subject to his right to appeal the ruling on the motion to suppress. The trial court found appellant guilty and assessed punishment at confinement for one year. The trial court then suspended the sentence and placed Appellant on community supervision. On appeal, Appellant argues in three issues that (1) the trial court abused its discretion by excluding certain evidence from the suppression hearing, (2) the breath test results should have been suppressed because they were obtained in violation of the law, and (3) the breath test results should have been suppressed because they were not reliable.

We affirm.

### Background

Appellant was arrested in the early morning hours of January 7, 2012 for driving while intoxicated. Appellant stipulated at the suppression hearing that reasonable suspicion existed for a detention, that probable cause justified his arrest, and that the required statutory warnings were properly given to him. The arresting officers took Appellant to a nearby gas station. Parked at the gas station was a

---

1. *See* Tex. Penal Code Ann. § 49.04(a) (Vernon 2014).

Houston Police Department Breath Alcohol Testing van. Appellant agreed to give a breath test.

Officer D. Ciers testified at the suppression hearing. He testified that he brought appellant into the van and closed the door. It was a cool morning—about 72 degrees Fahrenheit inside the van—and the air conditioner was not running in the van. Officer Ciers observed Appellant for a 15-minute period and then conducted the breath test using a machine mounted inside the van called the Intoxilyzer 5000.

Ronald Oliver, a technical supervisor for the Texas Department of Public Safety, also testified at the suppression hearing. Part of Oliver's responsibilities as a technical supervisor was to regularly inspect and calibrate the breath test machines. Oliver testified that the breath test machine used on Appellant was inspected about one week before Appellant's test. He also testified that Appellant's test was the first one after the inspection. When questioned about whether the inspections on the machines were valid when the machines were used in a mobile van, Oliver testified,

> A testing site is a testing site. Whether it has wheels or not doesn't make any difference. If the testing site is appropriate, then you can get good, valid alcohol results from that instrument. If it's in a bad location, whether it have wheels or not have wheels; that we have testing sites in jails that overheat and there are times when we can't run tests, then that physical location is it's just too hot or too cold.

Oliver also testified about the approval of the Houston Police Department's breath testing program by the Texas Department of Public Safety's scientific director. Specifically, Oliver testified,

> Q. And is [the Intoxilyzer 5000 that was used on Appellant] certified by the scientific director of the Texas Department of Public Safety?
>
> A. Yes.
>
> Q. And was it certified on the date of January 7th, 2012?
>
> A. That is correct.
>
> Q. And is that instrument used as a part of the breath test program?
>
> A. That is correct.
>
> Q. Are you responsible for the maintenance of that instrument?
>
> A. I was, yes.

Finally, Oliver testified at trial about the Intoxilyzer 5000's many failsafes for inaccurate breath tests. The machine tests for the presence of alcohol, specifically ethanol. Ethanol absorbs a specific wavelength of infrared light. When that wavelength of light is passed through the air chamber, less of the light will come out the other side of the chamber due to its absorption by the ethanol. A measure of the decrease in the amount of the infrared light establishes the amount of ethanol present in the sample.

Other known chemicals can also absorb infrared light at the same wavelength. These are called interferents and can potentially cause a false identification of ethanol. To account for this, the machine also tests for five known interferents, such as acetone. If any interferents are detected, the machine subtracts the amount of interferents detected from the total amount detected for the test wavelength.

Every time the machine is run, it performs a test of its internal components to ensure that the circuitry is functioning properly. If it is not functioning properly, the test ends and the report explains an error occurred.

Next, it purges the system of the air in it at the time, drawing in air from its current environment. The machine then tests that air sample. The test subject

then breathes into a tube connected to the machine. The machine tests that breath sample as well. It then performs another test from the current environment. After that, the machine then tests what is known as a reference sample. The reference sample is designed to produce a result for a specific volume of alcohol. The test subject then breathes again in the tube, and the machine tests that sample as well. Another sample of the air in the current environment is tested. Finally, the machine draws another sample in from the environment and tests it again.

After the tests are complete, the machine prints out a report showing the results for each test. If any errors occur during the testing, the report explains an error occurred and does not include the testing results. Potential errors include improperly functioning circuitry, overheating, being overly cold, interferents being detected in the ambient air samples, and the two breath samples from the test subject being too far apart.

In the present case, the report did not identify any errors. It identified the alcohol concentration for the first air sample at 0.000. It identified the alcohol concentration for Appellant's first breath sample at 0.158.[2] It identified the alcohol concentration for the second air sample at 0.000. The reference sample was predicted to identify an alcohol concentration of 0.080. The machine identified the alcohol concentration for the reference sample at 0.077. It identified the alcohol concentration for the third air sample at 0.000. It identified the alcohol concentration for Appellant's second breath sample at 0.168. Finally, it identified the alcohol concentration for the fourth air sample at 0.000.

Appellant presented the expert testimony of Raymond McMains. McMains had

been a technical supervisor for the Texas Department of Public Safety for 17 years. McMains testified that he was aware of some tests where ethanol and acetone were tested in a sample together. "And a few times it did not detect that. And in one case it didn't subtract it because they used a .08 solution and it showed up a .09." McMains also testified that, based on his study of breath tests conducted throughout the state from 2007 to 2011, "the Houston [breath alcohol testing] vans were nine times more likely to detect an interferent than a nonmobile Intoxilyzer site."

After all the witnesses had testified, Appellant offered into evidence a marketing brochure from the company that makes the Intoxilyzer 5000. The brochure was for a machine called the Intoxilyzer 8000. There was no sponsoring witness.

### Admission of Evidence

In his second issue, Appellant argues the trial court abused its discretion by excluding a marketing brochure for another machine made by the company that makes the Intoxilyzer 5000.

### A. Standard of Review & Applicable Law

With the exception of rules concerning privileges, the Texas Rules of Evidence do not apply in a suppression hearing. TEX.R. EVID. 101(d)(1)(A), 104(a); *Granados v. State*, 85 S.W.3d 217, 227 (Tex.Crim.App.2002). Instead, "[t]he trial judge makes a legal ruling to admit or exclude evidence based upon the relevance and reliability of the factual information submitted by the parties." *Ford v. State*, 305 S.W.3d 530, 535 (Tex.Crim.App.2009). We afford "great deference" to the trial court's decision to admit or exclude evi-

---

2. Breath tests in Texas are a measurement of grams of alcohol per 210 liters of breath.

TEX. PENAL CODE ANN. § 49.01(1)(A) (Vernon 2011).

dence in a hearing on a motion to suppress, and we will overturn that decision on appeal only when "a flagrant abuse of discretion is shown." *Delao v. State*, 235 S.W.3d 235, 238 (Tex.Crim.App.2007).

## B. Analysis

■ After all the witnesses had testified, Appellant offered into evidence two marketing brochures from the company that makes the Intoxilyzer 5000. The first brochure was for the Intoxilyzer 5000. The second brochure was for a machine called the Intoxilyzer 8000. The Intoxilyzer 8000 brochure states that it is "fully mobile." The Intoxilizer 5000 brochure does not address its ability to be used in mobile environments.

The State had no objection to the brochure for the Intoxilizer 5000, but objected that the brochure for the Intoxilizer 8000 was not relevant. The trial court agreed and sustained the objection for the Intoxilizer 8000 brochure.

Even assuming the trial court's exclusion of the Intoxilizer 8000 brochure was error, Appellant must establish that the error was harmful. Appellant's argument for harm is contained in one sentence. "Had the trial judge considered the content of the brochures as evidence of the manufacturer's purpose and design of the different Intoxilizers, her ruling may have been different."

■ Even when the rules of evidence do apply, we evaluate harm in the admission or exclusion of evidence for non-constitutional error. *Ray v. State*, 178 S.W.3d 833, 836 (Tex.Crim.App.2005). For non-constitutional errors, we disregard errors that do not affect the appellant's substantial rights. Tex.R.App. P. 44.2(b); *Robinson v. State*, 236 S.W.3d 260, 269 (Tex. App.-Houston [1st Dist.] 2007, pet. ref'd). An error affects a substantial right only when the error had a substantial and injurious effect or influence on the jury's verdict. *Robinson*, 236 S.W.3d at 269 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997)). In contrast, "if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless." *Ray*, 178 S.W.3d at 836.

The only relevance that can be attributed to the Intoxilizer 8000 brochure is to show that the machine has been advertised as "fully mobile." The Intoxilizer 5000 brochure is silent on this issue. At best, this creates a weak inference that, because the Intoxilizer 5000 brochure did not advertise that the machine was fully mobile, the machine may not have been intended to be used in mobile environments. Accordingly, we are fairly assured that the excluded brochure, if admitted, would only have had a slight effect on the trial court's decision.

We overrule Appellant's second issue.

### Motion to Suppress

In his first issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was performed in violation of article 38.23 of the Texas Code of Criminal Procedure. *See* Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005). In his third issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was not reliable pursuant to rules 702 and 705 of the Texas Rules of Evidence. *See* Tex.R. Evid. 702, 705(c).

## A. Standard of Review

■ We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex.Crim.App.2013). We review the trial court's factual findings

for abuse of discretion and review the trial court's application of the law to the facts de novo. *Id.* Almost total deference should be given to a trial court's determination of historical facts, especially those based on an evaluation of witness credibility or demeanor. *Gonzales v. State,* 369 S.W.3d 851, 854 (Tex.Crim.App.2012). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex.Crim.App. 2002); *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000). "If the trial judge makes express findings of fact, we view the evidence in the light most favorable to his ruling and determine whether the evidence supports these factual findings." *Valtierra v. State,* 310 S.W.3d 442, 447 (Tex.Crim. App.2010). We will defer to the trial court's fact findings and not disturb the findings on appeal unless the trial court abused its discretion in making a finding not supported by the record. *Cantu v. State,* 817 S.W.2d 74, 77 (Tex.Crim.App. 1991).

## B. Legality of Breath Test

In his first issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was performed in violation of article 38.23 of the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23(a). Appellant's essential argument is that the Texas Department of Public Safety's Standard Operating Guidelines for the breath test machines does not permit the Intoxilyzer 5000s to be used in a mobile location without an inspection at each new location. Accordingly, Appellant argues, because the Intoxilyzer 5000 had not been inspected upon being moved to the location where Appellant was tested, the breath test was performed in violation of the law and must be suppressed.

The State argues that, to determine whether a breath test was performed in compliance with the law, courts cannot look beyond the relevant statutes and regulations. Because the Texas Department of Public Safety's Standard Operating Guidelines are neither statutes nor regulations, the State argues, the Standard Operating Guidelines cannot be a basis for suppressing the breath test.

Article 38.23 of the Texas Code of Criminal Procedure provides,

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

*Id.* Typically, "noncompliance with administrative agency rules does not provide a basis for the exclusion of evidence under article 38.23." *Atkinson v. State,* 923 S.W.2d 21, 23 n. 1 (Tex.Crim.App.1996), *abrogated on other grounds by Motilla v. State,* 78 S.W.3d 352 (Tex.Crim.App.2002). When a statute specifically makes evidence inadmissible when it has been obtained in violation of agency regulations, however, the regulations become a part of the analysis. *See id.*

In *Atkinson,* the Court of Criminal Appeals held that the then-applicable version of a statute incorporated review of the applicable regulations into the determination of whether there was a violation of article 38.23. *See id.* at 23 & n. 1. The State argues that a change in the text of the statute establishes that the regulations do not need to be considered any more.

The statute in effect under *Atkinson* provided, in pertinent part, "Analysis of a specimen of the person's breath, to be

considered valid under the provisions of this section, must be performed according to rules of the Texas Department of Public Safety ...." Act of May 27, 1983, 68th Leg., R.S., ch. 303, § 3, 1983 Tex. Gen. Laws 1568, 1576–77, *repealed by* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.15, 1993 Tex. Gen. Laws 3586, 3704 (formerly TEX.REV.CIV. STAT. ANN. art. 67011–5, § 3(a)).

The State correctly points out that the phrase "to be considered valid" does not appear in the current version of the statute. *See* TEX. TRANSP. CODE ANN. § 724.016(a) (Vernon 2011). Instead, the current version of the statute provides, in pertinent part, "A breath specimen taken at the request or order of a peace officer must be taken and analyzed under rules of the department." *Id.* The State argues that the removal of the phrase "to be considered valid" indicates an intention on the part of the Texas Legislature to remove the administrative regulations as part of the review for compliance with the law under article 38.23. We must disagree.

Former article 67011–5 was repealed and current section 724.016 was enacted due to the creation of the Transportation Code. *See* TEX. TRANSP. CODE ANN. § 1.001 (Vernon 2011). The Revisor's Note to section 724.016 explains,

> Section 3(b), V.A.C.S. Article 67011–5, provides that analysis of a specimen of a person's breath, "to be considered valid under the provisions of this section," must be performed according to rules of the Department of Public Safety by an individual possessing a certificate issued by the department. The revised law omits the quoted language as unnecessary because it is implemented by the use of the word "must."

*Id.* § 724.016 revisor's note; *see also* TEX. TRANSP. CODE ANN. vol. 1, preface, p. III (Vernon 2011) ("The proposed Transportation Code, as submitted to the Texas Legislature by the Legislative Council, contained Revisor's Notes under various sections. These Notes ... were not included in the Code as enacted, but are supplied under selected sections in this edition as an aid to research and interpretation."). Additionally, the creation of the Transportation Code was intended to consolidate the relevant statutes for a topic within a code "without substantive change." TEX. TRANSP. CODE ANN. § 1.001(a). Because the creation of the Transportation Code was not intended to make substantive changes to the statutes and because the phrase "to be considered valid under the provisions of this section" was removed because it was considered redundant, we hold *Atkinson* still applies, and we must still look to the administrative code to determine whether there has been a violation of the law.

■ The question becomes, then, whether the relevant regulations further incorporate the Texas Department of Public Safety's Standard Operating Guidelines into the determination of whether the law has been violated as Appellant argues. Appellant correctly argues that all Texas agencies must perform their breath tests under an approved breath test program. *See* 37 TEX. ADMIN. CODE § 19.4(a), (b)(3), (f)(6). Appellant argues that we must then consider the program's operating guidelines to determine whether the law has been violated. We disagree.

As we note above, typically, "noncompliance with administrative agency rules does not provide a basis for the exclusion of evidence under article 38.23." *Atkinson,* 923 S.W.2d at 23 n. 1. The Court of Criminal Appeals held *in Atkinson,* however, that the statutory requirement that " '[a]nalysis of a specimen of the person's breath, to be considered valid ..., must be

performed according to rules of the Texas Department of Public Safety ...." " created an exception to the typical analysis and compelled consideration of the regulations. *Id.* at 23 & n. 1 (quoting then-applicable predecessor to section 724.016 of Texas Transportation Code). The requirement that the test be performed according to the regulations drew the regulations into consideration. *See id.*

The corollary language in the Texas Department of Public Safety's regulations provides, "All breath alcohol testing techniques, methods and programs to be used for evidential purposes must have the approval of the scientific director." 37 TEX. ADMIN. CODE § 19.4(a). What is compelled here, as opposed to what was compelled in *Atkinson,* is approval of the scientific director, not performance according to the rules set forth in the standard operating guidelines. *Id.* As long as the regulations have been complied with—including obtaining approval of the scientific director— then article 38.23 has been satisfied. *See id.; Atkinson,* 923 S.W.2d at 23 & n. 1.

The "scientific director" is "[t]he individual or his designee responsible for the implementation, administration and enforcement of the Texas breath alcohol testing regulations." 37 TEX. ADMIN. CODE § 19.1(20). This is the scientific director for the Texas Department of Public Safety. The testimony at the hearing concerning approval is as follows:

Q. And is [the Intoxilyzer 5000 used on Appellant] certified by the scientific director of the Texas Department of Public Safety?

A. Yes.

Q. And was it certified on the date of January 7th, 2012?

A. That is correct.

Q. And is that instrument used as a part of the breath test program?

A. That is correct.

Q. Are you responsible for the maintenance of that instrument?

A. I was, yes.

While not the most direct way of establishing approval of the program by the scientific director, the trial court could have reasonably inferred that the scientific director would not certify a machine for use in a program that had not been approved.[3]

Appellant also relies on subsection (f) of section 19.4 of the Texas Department of Public Safety's regulations to argue that the guidelines are incorporated into the 38.23 analysis. 37 TEX. ADMIN. CODE § 19.4(f). Subsection (f) provides,

Approval of any breath alcohol testing program is contingent upon the applying agency or laboratory's agreement to conform and abide by any directives, orders, or policies issued or to be issued by the scientific director regarding any aspect of the breath alcohol testing program; this shall include, but not be limited to, the following ....

*Id.* This subsection concerns an applying agency's necessary agreements in order to have their program approved by the scientific director. This does not specifically incorporate any of those agreements into the 38.23 analysis. Regulations commonly have requirements in addition to those specifically mandated under the law. But

---

3. Moreover, this testimony came from Ronald Oliver, a technical supervisor from the Texas Department of Public Safety. "Technical supervisors, when required, shall provide expert testimony ... concerning the approval of techniques, methods and programs under their supervision." 37 TEX. ADMIN. CODE § 19.4(h). The trial court could have further reasonably concluded that Oliver would not have testified about the validity of a program that had not been approved.

those regulations are commonly left out of the 38.23 analysis. *See Atkinson,* 923 S.W.2d at 23 n. 1; *see also Garza v. State,* 126 S.W.3d 79, 85–86 (Tex.Crim.App.2004) (rejecting reliance on regulation to establish violation of 38.23 because no statute declaring violation of agency rule was violation of law). Accordingly, the mere fact that the agency regulations provide requirements for approval does not establish that the regulations intended to make violations of the agreements constitute violations of law.

We hold that there is evidence in the record that the breath test was obtained in compliance with the law for purposes of article 38.23 of the Texas Code of Criminal Procedure. We overrule appellant's first issue.

## C. Reliability of Breath Test

In his third issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was not reliable pursuant to rules 702 and 705 of the Texas Rules of Evidence. *See* TEX.R. EVID. 702, 705(c). As in his first issue, Appellant's essential argument is that the Texas Department of Public Safety's Standard Operating Guidelines for the breath test machines does not permit the Intoxilyzer 5000's to be used in a mobile location without an inspection at each new location. Because the Intoxilyzer 5000 had not been inspected once it was at the location where Appellant was tested, Appellant argues, the results lack scientific reliability and, accordingly, must be suppressed.

 When a defendant challenges the reliability of scientific evidence in a motion to suppress, the State bears the burden at the hearing to establish reliability. *State v. Esparza,* 413 S.W.3d 81, 86

(Tex.Crim.App.2013). Rule 702 of the Texas Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. Typically, in order for scientific evidence "to be considered sufficiently reliable as to be of help to a jury," the evidence must satisfy three criteria: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Reynolds v. State,* 204 S.W.3d 386, 390 (Tex.Crim.App. 2006) (citing *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992)).

 In the context of breath test evidence, however, the analysis is modified. "[T]he Legislature has already determined that the underlying science is valid, and that the technique applying it is valid as long as it is administered by individuals certified by, and using methods approved by the rules of, DPS." *Id.* (citing TEX. TRANSP. CODE ANN. § 724.064 (Vernon 2011)). The only determination for a trial court to make in what is called a *Kelly* hearing, then, is "whether the technique was properly applied in accordance with the rules of DPS on the particular occasion in question." *Id.* at 391.

 It is in the context of determining whether scientific results were obtained "using methods approved by the rules of DPS" that we agree with Appellant that the determination of whether the standard operating guidelines were followed becomes relevant.[4] In order to make this

---

4. Even if we held that the guidelines were not followed, we would still have to analyze (1)

determination, however, certain evidence presented at the hearing must first be established.

A police officer conducting the breath test does not need to "be able to articulate the scientific principle behind the apparatus or the technology implementing it." *Id.* Instead, the officer must be supervised by a technical supervisor that understands the underlying scientific principles. That technical supervisor must also perform periodic tests on the instruments used by the police officers. According to the Standard Operating Guidelines for Technical Supervisors in effect at the time of Appellant's breath test,[5] the technical supervisor must perform two types of periodic tests on the instruments: inspections and calibration. A calibration is a test of known alcohol concentrations to ensure that the machine is correctly identifying the amount of alcohol in its tests. In contrast, an inspection involves (1) ensuring that the machine detects and subtracts the effect of acetone and (2) conducting a breath test in the normal testing mode. Appellant's complaint focuses on the inspection of the machine that he used.

The relevant standard operating guidelines were admitted into evidence. They provide,

1.1 An official inspection by a Technical Supervisor can only be conducted at the evidential testing location. Each part of the inspection shall occur at the testing location and includes not only the instrument, but the associated equipment and the testing environment as a whole.

1.1.1 The capability of the instrument to detect and subtract the effect of acetone shall be tested.

. . . .

1.1.2 A Technical Supervisor shall conduct a breath test in the normal subject testing mode used for evidential testing

1.1.3 A Technical Supervisor may conduct additional tests or checks of the instrument and simulator as he/she deems necessary.

1.2 A complete inspection (1.1) shall be performed by a Technical Supervisor each time an instrument is placed into or returned to service at a testing location.

Appellant's argument focuses on the phrase "testing location" as used in these guidelines. It is undisputed that "testing location" is not defined as it applies to the standard operating guidelines. Appellant argues that "testing location" should be interpreted to mean a fixed, physical location. Based on that interpretation, Appellant argues that the breath testing machines are incompatible with use in a mobile van unless the instrument is inspected each time it moves to a new location.

In contrast, Oliver testified that, for purposes of the breath alcohol testing vans, "testing location" meant the van itself, regardless of the fixed, physical location that

whether any deviation from the guidelines results in a *per se* determination of unreliability and (2), if not, whether the particular deviation required a determination of unreliability. As the State points out, the Standard Operating Guidelines covers a broad range of matters, including record keeping and electronic data management. In essence, the State is arguing that requiring a *per se* rule would result in a back-door 38.23 analysis for the standard operating guidelines. Because we hold that the guidelines were followed, however, we do not need to reach this issue.

5. Appellant offered into evidence only the first page of the Standard Operating Guidelines for Technical Supervisors in effect at the time. Nevertheless, Oliver testified as to his responsibilities as a technical supervisor.

the van is in at any given time. He testified,

> A testing site is a testing site. Whether it has wheels or not doesn't make any difference. If the testing site is appropriate, then you can get good, valid alcohol results from that instrument. If it's in a bad location, whether it have wheels or not have wheels; that we have testing sites in jails that overheat and there are times when we can't run tests, then that physical location is it's just too hot or too cold.

Oliver testified that the inspection for the instrument in question was performed about one week before Appellant's breath test and that Appellant's test was the first test performed after the inspection.

 We agree that "testing location" is not defined as it applies to the standard operating guidelines. We also agree with Appellant that undefined terms like this are typically given their ordinary meaning. *Watson v. State*, 369 S.W.3d 865, 870 (Tex.Crim.App.2012). We disagree, however, that anything in the guidelines compels the interpretation that the location must be a fixed location.[6] Oliver testified as the representative for the Department of Public Service. The Department of Public Service is the agency tasked with "adopt[ing] rules approving satisfactory analytical methods." Tex. Transp. Code Ann. § 724.016(b)(1). Accordingly, the representative of the agency that drafted the standard operating guidelines pursuant to its legislative authority

testified that "testing location" meant the van itself and not the fixed physical location the van might be in at any given time. We hold this interpretation is reasonable and a different interpretation is not compelled.

Appellant argues that the requirement that the inspection includes "the testing environment as a whole" and that such an inspection cannot be conducted when the testing machine is mobile. Oliver acknowledged that inspection includes the testing environment as a whole, but also testified that whether a site is mobile is not relevant to the inspection process.[7] The trial court agreed with Oliver, and we find no reason to overturn this. Accordingly, we hold the State carried its burden of establishing that "the technique was properly applied in accordance with the rules of DPS on the particular occasion in question." *Reynolds*, 204 S.W.3d at 391; *see also Esparza*, 413 S.W.3d at 86 (holding State carries initial burden of establishing reliability of scientific evidence).

Once the State carried its initial burden, the burden then shifted to Appellant to establish that the evidence was otherwise unreliable. *See Pham v. State*, 175 S.W.3d 767, 773 (Tex.Crim.App.2005) (holding ultimate burden of persuasion is on movant in motion to suppress hearing). Appellant argued that the breath test was unreliable because the machine was not in the location where it was inspected and, accordingly, there was no assurance that the ma-

---

6. In civil cases, "[i]f there is vagueness, ambiguity, or room for policy determinations in a statute or regulation ... we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex.2011). We see no reason that this rule should not apply in criminal cases.

7. Appellant points out that Oliver also testified that, if he moved a breath test machine assigned to a fixed, physical location, he would perform another inspection of the instrument, even if the machine was moved to a new location in the same room. There was no testimony, however, that the additional inspection was a requirement of the standard operating guidelines.

chine was properly detecting what are known as interferents. Further, appellant points out that the van was at a gas station, which could contain a large number of unknown interferents in the air.

Oliver testified at trial about the Intoxilyzer 5000's many failsafes for inaccurate breath tests. The machine tests for the presence of alcohol, specifically ethanol. Ethanol absorbs a specific wavelength of infrared light. When that wavelength of light is passed through the air chamber, less of the light will come out the other side of the chamber due to its absorption by the ethanol. A measure of the decrease in the amount of the infrared light establishes the amount of ethanol present in the sample.

Other known chemicals can also absorb infrared light at the same wavelength. These are called interferents and can potentially cause a false identification of ethanol. To account for this, the machine also tests for five known interferents, such as acetone. If any interferents are detected, the machine subtracts the amount of interferents detected from the total amount detected for the test wavelength.

Every time the machine is run, it performs a test of its internal components to ensure that the circuitry is functioning properly. If it is not functioning properly, the test ends and the report explains an error occurred.

Next, it purges the system of the air in it at the time, drawing in air from its current environment. The machine then tests that air sample. The test subject then breathes into a tube connected to the machine. It then performs another test from the current environment. After that, the machine then tests what is known as a reference sample. The reference sample is designed to produce a result for a specific volume of alcohol. The test subject then breathes again in the tube, and the ma-

chine tests that sample as well. Another sample of the air in the current environment is tested. Finally, the machine draws another sample in from the environment and tests it again.

After the tests are complete, the machine prints out a report showing the results for each test. If any errors occur during the testing, the report explains an error occurred and does not include the testing results. Potential errors include improperly functioning circuitry, overheating, being overly cold, interferents being detected in the ambient air samples, and the two breath samples from the test subject being too far apart.

In the present case, the report did not identify any errors. It identified the alcohol concentration for the first air sample at 0.000. It identified the alcohol concentration for Appellant's first breath sample at 0.158. It identified the alcohol concentration for the second air sample at 0.000. The reference sample was predicted to identify an alcohol concentration of 0.080. The machine identified the alcohol concentration for the reference sample at 0.077. It identified the alcohol concentration for the third air sample at 0.000. It identified the alcohol concentration for Appellant's second breath sample at 0.168. Finally, it identified the alcohol concentration for the fourth air sample at 0.000.

It is important to point out that Appellant did not establish proof of any interferents for which the machine did not already test. In other words, Appellant did not identify any chemical compounds that would absorb the test infrared wavelength that the machine could not already detect. To the contrary, the air samples from the environment both tested as having an alcohol concentration of 0.000. Appellant argues in his brief that there are a large number of compounds present in the air at

a gas station that *could* create a false positive. Similarly, Appellant hypothesizes that there could be compounds that would not be detected in the air but might create false positives when metabolized and exhaled in human breath. This is pure speculation, however, and does nothing to advance Appellant's burden of persuasion or to show how the trial court abused its discretion. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex.Crim.App.2007) (holding speculation is insufficient to carry burden).

The most substantive proof of failure to detect interferents came from the testimony of Appellant's expert, McMains. McMains testified that he was aware of some tests where ethanol and acetone were tested in a sample together. "And a few times it did not detect that. And in one case it didn't subtract it because they used a .08 solution and it showed up a .09." Based on this testimony, the greatest potential variance that has been established is a difference of 0.01 when ethanol and acetone were present together. Appellant's breath tests, however, were 0.158 and 0.168. The legal limit in Texas is 0.08 grams of alcohol per 210 liters of breath. *See* TEX. PENAL CODE ANN. §§ 49.01(1)(A), (2), 49.04(a) (Vernon 2011). Even if the trial court found this testimony credible and credited it, adjusting the variance in the combined presence of alcohol and acetone, Appellant's lowest breath test was still 0.068 grams of alcohol per 210 liters of breath over the legal limit. We hold the trial court could have reasonably determined that, in Appellant's circumstances, a potential 0.01 variance did not render his breath test unreliable.

McMains also testified that, based on his study of breath tests conducted throughout the state from 2007 to 2011, "the Houston [breath alcohol testing] vans were nine times more likely to detect an interferent than a nonmobile Intoxilyzer site." Even assuming the trial court found this testimony credible and credited it, McMains's testimony concerns the machines' successful detection of interferents. Given the uncontradicted testimony that the machines would report an error when it detected interferents in the ambient air and would exclude the effects of interferents when present in breath samples, Appellant has failed to establish how such detections would cause the test results to be unreliable.

We hold the State carried its burden of establishing that the breath tests were reliable. We hold Appellant failed to carry his burden, after the burden shifted to him, that the tests were unreliable. Accordingly, we overrule Appellant's third issue.

### Conclusion

We affirm the judgment of the trial court.

Justice BROWN, concurring in part and dissenting in part.

HARVEY BROWN, Justice, concurring and dissenting.

Are test results from a breathalyzer machine that has been reliably used for many years in a fixed location still reliable when the machine is moved into a police van, jostled through the streets of Houston, and used in admittedly varying ambient air conditions? It depends. While it is possible that the breathalyzer's test results may be reliable in a mobile environment, the State in this case did not make a sufficient showing of reliability to meet its burden to establish admissibility of the mobile test results under Rule 702. I, therefore, respectfully dissent. But I concur in the Court's conclusion that the test results did not violate article 38.23 of the Texas Code of Criminal Procedure.

## Factual Background

The Houston Police Department has used breathalyzer machines, known as Intoxilyzer 5000s, at its police station for many years to measure the alcohol concentration in suspects' breath samples. At some point, the police chose to relocate the Intoxilyzer 5000s into police vans known as Breath Alcohol Testing vans (BAT vans). The Intoxilyzer 5000s are mounted inside the vans to be used on location at vehicle stops.

In January 2012, Schultz was detained for suspicion of drunk driving, and a BAT van was summoned. The police moved Schultz to a nearby gas station, where the BAT van met them and Schultz's blood alcohol content was tested. The mobile Intoxilyzer 5000 measured Schultz's alcohol concentration at considerably higher than the concentration sufficient to support a conviction.

Before trial, Schultz made an oral motion to suppress the results of the test. The court set it for a hearing. Schultz objected that the scientific predicate for admissibility of the breath test had not been satisfied under Rules 702 and 705 of the Texas Rules of Evidence. He also objected that the test results were inadmissible under article 38.23 because they were in violation of DPS standard operating guidelines. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23 (West 2005). He concluded that the State could not "establish the predicate or the admissibility of the breath test in this case."

At the hearing, the trial court heard evidence regarding the protocol for administering a breath test on a suspect. Officer Ciers, who is a certified operator, observed Schultz for the required 15 minutes before administering the breath test. Officer Ciers then submitted the machine to a circuitry test, which it passed. He also tested the level of identifiable interferents in the ambient air, which the machine measured at 0.00 four times. Officer Ciers took two breath samples from Schultz; before each, he purged the system with ambient air.

There also was testimony concerning prior testing and maintenance on the Intoxilyzer 5000 that Officer Ciers used to measure Schultz's alcohol concentration. Technical Supervisor Oliver testified that he had inspected the machine one week before Schultz's arrest, in accordance with a monthly inspection schedule. He checked the machine's filter for interferents—four substances that could contaminate a breath sample and possibly elevate the alcohol reading. The inspection protocol does not test for all possible interferents, only those four specified substances. Oliver verified that the interferent detection system was properly operating and none of the four interferents were inside the machine.

The State did not offer evidence of the relocation history of the machine. We do not know when the machine was relocated to the BAT van. Nor was there evidence of whether it was moved only once or repeatedly between the police station and the van or between vans.

Before Schultz's test, the machine had not been recalibrated for six months. The machine was not recalibrated when it was moved into the van, and therefore had been relocated at least once without further recalibration.

The State concedes that under *State v. Esparza*, 413 S.W.3d 81 (Tex.Crim.App. 2013), it bore the burden under the Rules of Evidence to "prove the evidentiary predicate for the admissibility of [this] scientific evidence."

## The Intoxilyzer 5000

The Intoxilyzer 5000 utilizes infrared spectrophotometry to measure ethyl alco-

hol in breath samples. It has been used by police departments across the country for years and, when its test results have been challenged in court, repeatedly found to be sufficiently reliable. *See, e.g., State v. Anderson,* 145 Idaho 99, 175 P.3d 788, 794 (Idaho 2008) ("[T]he Intoxilyzer 5000 was approved by the Idaho State Police almost two decades ago and is still in use."). Until recently, the Houston Police Department has used the Intoxilyzer 5000 at a fixed location—inside the police station. And the test results from the immobile Intoxilyzer 5000 have been used in Harris County courts for years as evidence of the ethyl alcohol concentration in suspects' breath samples, stated as a numerical percentage. *See, e.g., Heeth v. State,* No. 01–94–00975–CR, 1997 WL 212268, at *2 (Tex.App.-Houston [1st Dist.] 1997, no pet.) (mem. op., not designated for publication).

By contrast, portable breathalyzers—known as Passive Alcohol Sensors—traditionally have been used only to confirm the presence of alcohol in a suspect's breath sample; the portable machines have not been determined to reliably measure the concentration of alcohol in breath samples. *See Adams v. State,* 156 S.W.3d 152, 156 (Tex.App.-Beaumont 2005, no pet.); *Fernandez v. State,* 915 S.W.2d 572, 576 (Tex. App.-San Antonio 1996, no pet.).

By moving its Intoxilyzer 5000 into a mobile van, the police might achieve the best of both worlds: portability and admissible alcohol concentration results. But no Texas appellate court—nor any other appellate court that I have located—has addressed whether the Intoxilyzer 5000 can produce reliable results when removed from its fixed location or, if it can, the conditions required to obtain reliable test results.

Technical Supervisor Oliver testified that the manufacturer does not produce any literature or instructions regarding use of the Intoxilyzer 5000 in a mobile environment. There was evidence that members of HPD have raised questions about the reliability of the Intoxilyzer 5000 results when used in a mobile environment. Those questions specifically concerned the effect of heat on the machine. Oliver testified that, at the request of the Harris County District Attorney's office, he ran a "variety of tests" on four BAT vans for excessive heat using breath samples with four different levels of alcohol concentration. He ran close to 250 tests on the machines. Oliver testified that the results were valid; the machines would not allow testing when it got too hot because they would fail the circuitry check. When the temperature was "just below whatever the temperature is [that causes the machines not to produce test results]," the machines would produce "slightly lower results than what they should have been." When the machines were overheated and subsequently cooled, they did not produce false positives.

The State did not introduce these test results nor did Oliver provide details on the different test conditions. Oliver did not indicate whether he tested the machine to evaluate the effect of varying ambient air conditions on the accuracy of the test results. Nor did Oliver identify any published literature on the effect of ambient air temperatures or varying ambient air conditions on the machines. The Intoxilyzer 5000 used in Schultz's test was not one of the machines involved in Oliver's tests.

During the hearing, Schultz presented evidence that there is another breathalyzer available to police departments: the Intoxilyzer 8000, which also is manufactured by the same company. It is marketed as a mobile Intoxilyzer specifically designed for use in police vans. While it utilizes infra-

red spectrophotometry like the 5000 model does, the marketing brochure describes the 8000 machine as a more advanced model than the Intoxilyzer 5000.[1]

### Admissibility Under Article 38.23

Article 38.23 of the Texas Code of Criminal Procedure prohibits the introduction of evidence obtained in violation of the Constitution or laws of the United States or the State of Texas in a criminal trial. TEX.CRIM. PROC.CODE ANN. art. 38.23 (West 2005). The Court of Criminal Appeals in *Atkinson* stated that compliance with DPS regulations—which the Court also called rules—is mandatory for admissibility of the alcohol tests under article 38.23. *Atkinson v. State*, 923 S.W.2d 21, 23 (Tex. Crim.App.1996) *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex.Crim.App.2002). I agree with the Court that the DPS regulations function as a set of rules and compliance with them is mandatory.[2] *See Scillitani v. State*, 343 S.W.3d 914, 922 (Tex.App.-Houston [14th Dist.] 2011, pet. ref'd) (holding Intoxilyzer's results were admissible because they were obtained in conformity with governing regulations); *Scherl v. State*, 7 S.W.3d 650, 652 (Tex.App.-Texarkana 1999, pet. ref'd) ("[I]ntoxilyzer test results are admissible when performed in accordance with the Transportation Code and the Texas Department of Public Safety regulations.").

I concur with the Court that the test results were admissible under article 38.23. Under subsection (a) of Rule 19.4 of Title 37 of the Texas Administrative Code, the use of the Intoxilyzer 5000 for breath-alcohol testing must be approved by the Scientific Director. 37 TEX. ADMIN. CODE § 19.4(a). Proof of that approval is therefore necessary for breath-alcohol testing "to be used for evidentiary purposes." *Id.* ("All breath alcohol testing techniques, methods and programs to be used for evidential purposes must have the approval of the scientific director.").

The Scientific Director's approval is not the only condition for admissibility. If the Scientific Director's approval ends the inquiry, the State would not have to comply with the remainder of the regulations. Such a rule would be contrary to *Atkinson's* holding that the tests must comply with a 15–minute waiting period.

Therefore, we must also examine whether DPS's "guidelines," like DPS's regulations, operate as rules within the meaning of section 724.016 of the Texas Transportation Code, and therefore must be satisfied as a condition of admissibility. *Atkinson* does not answer this question; it addresses DPS regulations. The State argues that these "guidelines" are merely internal policies that do not appear in the Administrative Code or the Texas Register. According to the State, only those regulations reflected in the Administrative Code con-

---

1. The brochure describes the Intoxilyzer 8000 as "fully mobile" and specifically advertises its "rugged case." Neither attribute is advertised on the brochure for the Intoxilyzer 5000. The trial court erroneously refused to admit the brochure for the limited purpose of the Rule 104(a) hearing. I refer to it as part of the procedural history of the case. I do not rely on it to reach the conclusion that the State did not meet its burden of proof.

2. In addition to the reasons cited by the Court, this result is consistent with *Atkinson,*

which held that the State had to comply with DPS's requirement that a technician must continuously observe the person tested for at least 15 minutes before administering the test. 923 S.W.2d at 23. Normally, non-compliance with a regulatory rule would not require automatic exclusion, but the statute in question specifically requires compliance with DPS "rules." *Id.* at n. 1. The 15–minute delay provision is found in section 19.4(c)(1) of the Administrative Code.

stitute "laws" under article 38.23 or "rules" under section 724.016 of the Texas Transportation Code.

Schultz argues that sections 1.1 and 1.2 of the "Standard Operating Guidelines for Technical Supervisors" (SOGs) are mandatory and should be treated as DPS "rules" and "laws." Section 1.1 states that the technical supervisor's "official inspection ... can only be conducted at the evidential testing location. Each part of the inspection shall occur at the testing location and includes not only the instrument, but the associated equipment and the testing environment as a whole." Section 1.2 provides that the technical supervisor "shall" conduct a "complete inspection ... each time an instrument is placed into service or returned to service at a testing location." Both are mandatory.

The SOGs are adopted pursuant to Rule 19.4(f) of the Administrative Code, which grants the Scientific Director power to issue "directives, orders and policies." A footnote on the first page of the SOGs equates the guidelines with "policies." The title, "guidelines," suggests they are not rules, but the word is modified by the adjective "standard" suggesting that they are mandatory rules. Looking to the content of the only page in the record, some provisions contain mandatory language, but other sections contain permissive language.[3]

Given this language, and in absence of the remainder of the SOGs indicating a contrary interpretation, I would not treat the SOGs as "rules" for purposes of sec-

tion 724.016 of the Texas Transportation Code or as "laws" for purposes of article 38.23. In conclusion, admissibility of breath-alcohol tests under article 38.23 requires compliance with DPS regulations and therefore requires approval from the Scientific Director of the testing procedure, but does not require compliance with the guidelines.

### Admissibility Under Rule 702

#### A. The test for admissibility of breath test results

Under Texas law, the State must prove that breath-test results "accurately reflect the subject's alcohol concentration at the time of the offense." *Stewart v. State*, 129 S.W.3d 93, 98 (Tex.Crim.App.2004) (quoting *Bagheri v. State*, 119 S.W.3d 755, 760 (Tex.Crim.App.2003)). To be admissible, the Intoxilyzer 5000's test results must satisfy the requirements of *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992), as modified by the Texas Transportation Code and *Reynolds v. State*, 204 S.W.3d 386, 389–91 (Tex.Crim.App.2006).

In *Kelly*, the Court of Criminal Appeals held that the State must demonstrate by clear and convincing evidence three criteria for scientific evidence to be sufficiently reliable to be admissible: (1) the underlying scientific theory must be valid; (2) the technique used to apply the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. *Kelly* also provided a list of seven non-exclusive factors for examining reliability.[4] *Id.* La-

---

3. *See, e.g.,* SOG § 1.1.3 ("A Technical Supervisor may conduct additional tests or checks of the instrument and simulator as he/she deems necessary.").

4. The *Kelly* Court identified the following non-exclusive list of relevant factors for consideration: 1) the extent to which the underlying scientific theory and technique are ac-

cepted as valid by the relevant scientific community if such community can be ascertained; 2) the existence of literature supporting or rejecting the underlying scientific theory and technique; 3) the clarity with which the underlying scientific theory and technique can be explained to the court; 4) the potential rate of error of the technique; 5)

ter, in *Hartman v. State,* 946 S.W.2d 60, 62 (Tex.Crim.App.1997), the Court held that the multi-factor *Kelly* reliability test applies to Intoxilyzer test results.

In *Reynolds,* the Court harmonized Rule 702's requirements under *Kelly* with the Texas Transportation Code. 204 S.W.3d at 390–91. The Texas Transportation Code requires a breath specimen obtained by a police officer to "be taken and analyzed under rules of the department by an individual possessing a certificate issued by the department certifying that the individual is qualified to perform the analysis." TEX. TRANSP. CODE ANN. § 724.016(a) (West 2011). It also provides that DPS may adopt rules approving satisfactory analytical methods. *Id.* § 724.016(b). The Court in *Reynolds* held that the State did not have to show that the state trooper who conducted the breath test "was familiar with the science and technology that underlie the test." 204 S.W.3d at 387. The Court rejected the contention that this requirement existed under its precedents on breath tests or under *Kelly*. *Id.* at 389.

*Reynolds* also went beyond the narrow question before it and held that the first *Kelly* prong does not apply to breath-alcohol test results because "the Legislature has already determined that the underlying science is valid." *Id.* at 390. The Court modified the second *Kelly* prong— the prong that examines the validity of the application of the theory—to examine whether the specimen was analyzed by "individuals certified by, and using methods approved by the rules of, DPS." *Id.* The Court also modified the third *Kelly* prong—the "properly applied" inquiry— into whether the technique was properly applied in accordance with DPS's rules.

*Id.* at 391. The reason for the elimination of the first *Kelly* prong and the modification of the last two *Kelly* prongs was that "the Legislature has already determined" the validity of "the underlying science." *Id.* at 390; *see also id.* at 391 (stating that Legislature has determined that "the underlying scientific theory" for measuring alcohol concentration by analysis of breath specimens is "valid.").

I would not read *Reynolds* so rigidly as to foreclose the application of the *Kelly* factors when breathalyzers are used under new conditions that have not been tested by DPS and are not regulated by any specific DPS rules. Section 724.016 provides that compliance with any DPS rules is a *necessary* condition for the admissibility of the test results but does not indicate that it is a *sufficient* condition for admissibility. Common sense suggests that approved equipment used under new conditions may require testing to ensure that it is continuing to produce valid results. For example, calibration every six months may be perfectly reliable under normal conditions but not if an earthquake has shaken the foundation of the building where an Intoxilyzer 5000 is maintained.

The requirement that Intoxilyzer test results are admissible only when conducted in accordance with DPS rules first requires the existence of rules that govern the particular application of the Intoxilyzer. In the absence of rules for a new and untested condition, there can be no compliance with the rules. To give an example, if a new scientific method of measuring alcohol concentration from breath specimens is developed and a new piece of equipment is manufactured to implement this new scientific method, the results

the availability of other experts to test and evaluate the technique; 6) the qualifications of the expert testifying; and 7) the experience and skill of the person(s) who applied

the technique on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim.App.1992).

would not be valid until DPS developed rules governing the new equipment. The same is true here where a well-established piece of equipment is used under new and potentially significantly different test conditions.

In the earlier section on article 38.23, I have demonstrated that there are no rules for use of the Intoxilyzer 5000 in a BAT van. The State agrees; in its arguments regarding article 38.23, it contends that there are no DPS rules that specifically govern the use of the Intoxilyzer 5000 in a mobile environment. The Court is willing to allow the existing, general rules regarding the frequency of re-calibrations and re-inspections to apply in this new context. I disagree.

In my view, moving the Intoxilyzer from its fixed, indoor testing location to a mobile application raises an issue that the existing DPS rules do not address. In the absence of rules for this new application, it is impossible to conclude that the equipment was properly used "in accordance with the department's rules." But the absence of rules does not necessarily mean the application was unreliable. Therefore, the *Kelly* factors should be reviewed in determining whether the State demonstrated the reliability of the test results.

There is a second reason that I believe the *Kelly* reliability inquiry should apply here: the issue of the reliability of the Intoxilyzer 5000 in a mobile environment has trans-case scientific implications. Therefore, the *Kelly* factors should be applied to determine whether a mobile application of an Intoxilyzer 5000 presents a reliable methodology.

Under Texas law, the State had the burden to demonstrate reliability by clear and convincing evidence through the application of the *Kelly* factors. It did not.

## B. The State failed to satisfy its burden of showing that the Intoxilyzer 5000 was reliable under *Kelly*

Schultz contends that the Intoxilyzer results were inadmissible under the non-exclusive, flexible factors identified in *Kelly*. He asserts that those factors apply not only to the general methodology underlying the Intoxilyzer 5000 (i.e., infrared spectrometry to measure ethyl alcohol), but also to the methodology of using that piece of equipment in a mobile environment.

The State identifies no evidence that the theory in question—applying the Intoxilyzer 5000 in a mobile environment—is accepted in the relevant scientific community. It offered no literature demonstrating the reliability of the machine under new test conditions, i.e., in a mobile environment. It did not offer any marketing material or literature from the manufacturer suggesting it could be reliably used in those conditions. The State did not offer any test results from which a rate of error could be determined for breath test results from the machine after it has been driven on the road.

The only evidence from the State was Oliver's testimony that there is no evidence that placing the Intoxilyzer 5000 inside a van would change its calibration. But that misplaces the burden of proof. The State had to show that a mobile environment—with a jostling van—will not affect the machine's calibration. If the police maintain records of the recalibration analyses performed on its mobile Intoxilyzer 5000 units, that evidence could have been offered to demonstrate that mobile Intoxilyzer 5000s have not required more frequent or greater recalibrations than immobile machines. However, no such evidence was offered. On balance, the State has not shown by clear and convincing evidence that the *Kelly* factors demon-

strate the reliability of the Intoxilyzer 5000 in a mobile environment.

The Court concludes that the Standard Operating Guidelines are relevant to determining compliance with the *Kelly* factor that requires the specimen to be analyzed using methods approved by the DPS rules. The Court then concludes that only two SOG requirements are at issue—the requirements that DPS technical supervisors perform inspections at specified times (including each time the equipment is placed into service at a testing location) and periodically calibrate the equipment—and both were satisfied.

The SOGs do not specifically cover procedures for a mobile environment. But they do contain general provisions that support the conclusion that the test results were not in compliance and, therefore, are not reliable. Specifically, SOG 1.02 requires that "a complete inspection" be performed each time an instrument "is placed into or returned into service at a testing location." Technical Supervisor Oliver testified that he believed this requirement would mandate a complete re-inspection if the machine was simply moved a few feet across the room. Schultz's expert, a former DPS technical supervisor, agreed. Under that standard, an inspection was required when the machine was initially placed in the BAT van and then again if it was removed from and returned to the van. Thus, even if I were to accept the proposition that the phrase "testing location" in SOG 1.2 refers to the van, there is no evidence of when it was last moved into the van or whether it was inspected at the time. The inspection the week before Schultz's arrest was pursuant to a monthly inspection schedule, not in response to the machine being moved. There is simply no evidence of where that inspection occurred. And without any evidence concerning whether the machine was moved

into the van following that scheduled inspection, we cannot know if SOG 1.02 was met, even when reading it to refer to the van as the "testing location."

The State also did not present any evidence whether the machine remained in the van after the prior week's inspection; it may have been moved back and forth into the office or between vans. The State offered no evidence of how many miles the van(s) had driven with the machine inside after the inspection or where the machine had been used while in the field. I would conclude that the State did not demonstrate compliance with SOG 1.2. And to the extent these general SOGs are relevant to a determination of reliability in a new, untested condition, I would conclude they do not support the Court's conclusion that the SOGs were adequately satisfied to admit this evidence.

More problematic, though, is limiting the phrase "testing location" to mean the BAT van, ignoring that the van is driven around to various testing locations. SOG 1.1 states that a technical supervisor's official inspection must be conducted at "the evidential testing location." We should adopt the logical and textual meaning of the phrase "testing location." The location where the test results are obtained for evidentiary purposes is where the breath sample is submitted and tested. The testing location here was where the officer tested Schultz: the gas station.

The State failed to offer any evidence regarding the reliability of the Intoxilyzer 5000 when used in a mobile environment. Because the State did not meet its burden under *Kelly* to establish that the technique of collecting and testing a breath sample using an Intoxilyzer 5000 in a mobile application is reliable and, as a result, did not establish the reliability of the resulting data, I would conclude that the breath results were inadmissible and that the trial

court erred by denying Schultz's motion to suppress that evidence.

## Conclusion

The evidence here raises questions, but no assurances, regarding the reliability of the Intoxilyzer 5000 in a mobile environment. The State did not show how long the machine had been in the BAT van in question. We do not know if it was moved from the van or within the van after it was initially placed there. There is no evidence that the machine's calibration was ever tested in the BAT van. As a result, we simply do not know if the jostling that every moving vehicle experiences may have caused the machine to become miscalibrated, resulting in unreliable test results. It may not have; perhaps the mounting in the BAT van provides sufficient stability. We do not know, and the State does not tell us.

We also do not know whether the list of interferents tested for in the pre-sample protocol is adequate to ensure reliable test results in a mobile application versus a single, fixed testing location with a consistent source of ambient air. We only know that the machine tests for four specifically identified interferents, none of which were found in the BAT van at the Shell station. While the machine did not find any of the tested-for interferents, that is no assurance of reliability here. The issue here is not those interferents but other air contaminants that might be encountered at a gas station but would not be anticipated in a fixed, controlled environment. It is possible that the ambient air at the gas station had no effect on the reliability of the test results, but again we do not know.

The State may yet, in other cases, show that a mobile application is reliable, but it has not done so here. Accordingly, I re-spectfully dissent to the Court's holding on Rule 702.

